## Commonwealth v. Guzman

C.P. of Berks County, no. CP-06-CR-0003403-2008.

*Matthew G. Eltringham,* for Commonwealth.
*James M. Polyak,* for defendant.

YATRON, *J.,* October 28, 2008—This matter is before the court on defendant's omnibus pretrial motion in the nature of a motion to suppress physical evidence and statements allegedly made by the defendant. Hearing was held on October 3, 2008, and counsel for the parties filed timely memoranda including proposed findings of fact, conclusions of law, and legal authority therefor. On October 23, 2008, at the request of both counsel, the court entertained further oral argument, and the matter is now ripe for disposition.

What follows are findings of fact and conclusions of law in disposition of defendant's motion.

## FINDINGS OF FACT

(1) On or about June 18, 2008, officers of the Reading Police Department were conducting surveillance of an apartment building located at 16 South Tenth Street in the City of Reading.

(2) The purpose of the surveillance was to locate one Paul Talley.

(3) At the hearing on October 3, 2008, officers testified that Paul Talley was "wanted" for attempted homicide.

(4) No testimony was offered as to the existence of a warrant for Paul Talley's arrest, nor did the officers indicate that they were in possession of such a warrant.

(5) No warrant for the arrest of Paul Talley was presented at the October 3 hearing.

(6) On June 11, 2008, officers conducting surveillance in the vicinity of 16 South Tenth Street saw Paul Talley in the company of a number of other individuals, including his brother, Dushane, and one Javin Richardson, who was known on the street as "Jux."

(7) Previously, officers had frequently seen Paul Talley in the company of his brother, Dushane.

(8) The officers conducting surveillance on June 18 observed Dushane Talley, Jux, and another individual who was unknown to them, enter the premises at 16 South Tenth Street.

(9) Shortly after the entrance, officers observed an individual who was unknown to them leave the premises.

(10) This unknown individual was later identified as Demitri Guzman, defendant herein.

(11) Officers conducting the June 18 surveillance did not observe Paul Talley in the area.

(12) The surveillance officers contacted Criminal Investigator Pasquale Leporache, a 15-year veteran of the Reading Police Department and 13-year veteran of the

vice division and informed him of the observation of Dushane Talley, Jux and the unknown individual.

(13) CI Leporache proceeded to 16 South Tenth Street in order to attempt to locate Paul Talley.

(14) Upon arriving at that location, CI Leporache assigned two officers, including Officer Darren Smith to go to the rear of the premises in order to contain any individuals who might attempt to flee through the back door.

(15) It was CI Leporache's intent to conduct a "knock and talk" which would consist of knocking on the door and asking the occupants of the premises questions relating to the whereabouts of Paul Talley.

(16) Upon going to the front door of the premises, CI Leporache and CI Ed Heim observed that there were three mailboxes indicating the existence of three apartments in the building.

(17) The front door to the building led into a vestibule, and the front door was locked.

(18) CI Heim pressed the doorbell button for the first floor apartment where it was believed the individuals who were previously observed under surveillance had gone.

(19) Someone from within the premises responded to the doorbell by inquiring who was outside.

(20) The police officers did not respond to that inquiry.

(21) Shortly thereafter, CI Leporache was looking into the building through the glass panel contained in the front door and saw Dushane Talley and Jux exit the first floor apartment.

(22) Investigator Leporache saw a clear plastic bag containing what he recognized as marijuana in Jux's possession and heard one of the individuals exclaim "oh shit."

(23) Both individuals then quickly returned to the apartment and closed the door behind them.

(24) After making this observation, CI Leporache forced the vestibule door and went to the door for the first floor apartment.

(25) CI Leporache began loudly knocking on the door and declaring the presence of police officers, but no one responded to his knocking.

(26) When CI Leporache entered the vestibule and went to the door of the first floor apartment, he smelled the odor of burning marijuana which he determined to be coming from within the apartment.

(27) CI Leporache learned through a radio transmission that two individuals had run out the back door of the premises and upon seeing police officers barring their escape, the individuals ran back toward the rear door of the premises.

(28) CI Leporache continued knocking and demanding entry, and did so until the door was ultimately opened from the inside by Officer Darren Smith, one of the officers CI Leporache had assigned to the rear of the premises.

(29) Officer Smith recognized both Dushane Talley and Jux when they exited the rear of the premises, having had official contact with both of those individuals on prior occasions.

(30) Officer Smith gave chase, and was able to apprehend Dushane Talley before he was able to get back

into the building, and handcuffed him and took him into custody.

(31) Jux, however, was able to re-enter the premises and lock the door behind him.

(32) Officer Smith climbed part way up a fire escape to attempt to see into the apartment and also to ascertain if there was any activity with regard to the upstairs apartments in the building.

(33) After a short period of time, Jux exited through the rear door and Officer Smith was able to apprehend him and take him into custody.

(34) When Officer Smith apprehended both Dushane Talley and Jux at the rear of the premises, he detected the odor of marijuana on the two suspects, and could also smell marijuana from within the building.

(35) With both Dushane Talley and Jux in custody and handcuffed outside the building, Officer Smith went through the rear door, to the front door of the apartment and opened it permitting CI Leporache and other officers to enter.

(36) Officer Smith indicated he entered the apartment in order to admit the officers from the front of the apartment into its interior, to ascertain if Paul Talley was inside the apartment, and because due to the loud knocking he had heard, he indicated he believed that someone may have been attempting to break into the second floor apartment.

(37) Officer Smith was not aware of the fact that prior to the entry through the vestibule, CI Leporache had observed Jux in possession of the bag of marijuana.

(38) Once inside the apartment, the officers cleared each room to ensure that no individuals were present, and none were found.

(39) On the floor inside the apartment, however, CI Leporache observed the bag of marijuana previously in the possession of Jux, various drug paraphernalia including implements used in dividing and packaging cocaine and marijuana, and .32 caliber cartridges.

(40) CI Leporache then left the premises and proceeded to the office of MDJ Michael Leonardziak in order to procure a search warrant for the premises.

(41) The search warrant was admitted into evidence and is attached hereto as exhibit 1 [not published herein].

(42) The affidavit for search warrant contains no references to the hunt for Paul Talley, nor does it mention the existence of any arrest warrant for him.

(43) While CI Leporache was procuring the search warrant, the individual who had previously been observed leaving the premises, defendant Guzman, returned.

(44) The defendant indicated to the officers that he was the tenant of the apartment.

(45) Upon CI Leporache's return, he *Mirandized* all three individuals, at which time both Dushane Talley and Jux denied living in the apartment and having anything to do with the contraband located there.

(46) The search also turned up a .32 caliber handgun, which was subsequently determined to be inoperable.

(47) The defendant indicated that he had found the handgun in the alley the night before, and that it did not work and that he was unable to properly reassemble it.

(48) When Officer Smith made the initial police entry into the rear of the apartment, the officers possessed no search warrant, nor did they have the consent of the occupant, which was subsequently determined to, in fact, be defendant Guzman.

## CONCLUSIONS OF LAW

Even though there was a search warrant procured for the search of defendant's first floor apartment at 16 South Tenth Street, it is clear from the testimony, as well as from the warrant itself, that the observations which would supply probable cause for the search of the premises in relation to possession of controlled substances, possession with intent to deliver controlled substances, and delivery of controlled substances were virtually all made as a result of Officer Smith's warrantless entry into the apartment and the events that followed.

Further, while the defense contends that CI Leporache's forced entry into the locked vestibule also constituted an illegal entry, there is virtually nothing which flows from that entry that contributes to the probable cause affidavit in the search warrant. Clearly, CI Leporache's observation of Jux with the bag of marijuana was made from outside prior to the entry, and the only observation that CI Leporache made after entering the vestibule that is of any significance is his detection of the odor of burnt marijuana coming from the apartment. This, in and of itself, would not justify the issuance of the warrant.

Places of residence, under both our federal and state jurisprudence, are deemed entitled to special protection from intrusion. See *Commonwealth v. Santiago,* 736 A.2d

624 (Pa. Super. 1999).[1] Such intrusion may occur only pursuant to a proper warrant establishing probable cause for search, the consent of the occupant, or in certain very narrowly defined exigent circumstances. See *Commonwealth v. Roland,* 535 Pa. 595, 599, 637 A.2d 269, 270 (1994) (citing *Payton v. New York,* 445 U.S. 573, 583-90, 100 S.Ct. 1371, 1378-82, 63 L.Ed.2d 639, 648-53 (1980)). In the case at bar, it is both clear from the record and conceded by the Commonwealth that entry into the defendant's residence was without a warrant and without the defendant's consent. Therefore, the results of the search must be suppressed unless from all the facts and circumstances it can be determined that sufficiently exigent circumstances existed to justify the police intrusion.

The police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. *Commonwealth v. Roland,* 535 Pa. 595, 599, 637 A.2d 269, 270-71 (1994) (quoting *Welsh v. Wisconsin,* 466 U.S. 740, 749-50, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732, 743 (1984)). However, our jurisprudence recognizes that situations exist in which delay to seek a warrant will endanger life, limb or overriding law en-

---

1. "[P]robable cause alone will not support a warrantless search or arrest in a residence . . . unless some exception to the warrant requirement is also present. It is well settled that, absent consent or exigent circumstances, private homes may not be constitutionally entered to conduct a search or to effectuate an arrest without a warrant, even where probable cause exists. Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Id.* at 631 (quoting *Commonwealth v. Govens,* 429 Pa. Super. 464, 479-80, 632 A.2d 1316, 1322 (1993) (en banc).

forcement interests. In these cases, our strong preference for use of a warrant must give way to an urgent need for immediate action. *Santiago,* 736 A.2d at 631 (quoting *Commonwealth v. Govens,* 429 Pa. Super. 464, 480, 632 A.2d 1316, 1323 (1993)). In order to determine when the police possess an exigency justifying a warrantless search of a residence, a court should balance the following factors against one another:

"(1) the gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is strong reason to believe that the suspect is within the premises being entered, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, *i.e.,* whether it was made at night. These factors are to be balanced against one another in determining whether the warrantless intrusion was justified. Other factors may also be taken into account, such as whether there is hot pursuit of a fleeing felon, a likelihood that evidence will be destroyed if police take the time to obtain a warrant, or danger to police or other persons inside or outside the dwelling." See *Commonwealth v. Roland,* 535 Pa. 595, 599, 637 A.2d 269, 270-71 (1994).

After balancing these factors, this court holds that there was no exigency justifying Officer Smith's warrantless entry into the defendant's apartment. Officer Smith had no reason to believe that anyone was in the apartment at the time of his entrance. Therefore, there was no danger that evidence was being destroyed or that anyone posed a threat to him or the community. However, at the sup-

pression hearing, Officer Smith testified that he entered the apartment to look for Paul Talley, open the front door for the other officers, and to investigate a loud banging noise.

While there was testimony that Paul Talley was wanted for attempted murder, there was neither testimony nor evidence that the officers possessed an arrest warrant at the time of this incident. Furthermore, the officers testified that they went to the residence to engage in a knock and talk to ascertain Paul Talley's whereabouts. Therefore, they did not know if Paul Talley was even present in the apartment that afternoon. There was no evidence that Paul Talley lived in the apartment or had ever been seen inside. Rather, there was only evidence that he was, on one prior occasion, seen in the vicinity of the outside of the building. The speculative presence of an individual who is wanted for murder, along with the absence of an arrest warrant justifying an arrest, does not demonstrate the existence of an imminent danger to the police or the community justifying a warrantless intrusion.

The loud banging noise also fails to provide an exigency. Officer Smith testified that he thought someone was trying to break into the second floor apartment. However, he admits that he was not sure if there was anyone else present in the apartment or whether the apartment even had a second floor. Therefore, his entrance into the first floor apartment to investigate the banging, without more information, was speculative at best, and does not justify his warrantless entry into the residence. It is also important to reiterate that the banging was actually coming from CI Leporace's knocking

on the door. Our courts have acknowledged that the police cannot base a warrantless entry on an exigency of their own creation. See *Commonwealth v. Melendez,* 544 Pa. 323, 330, 676 A.2d 226, 229 (1996). For these reasons, the loud banging does not qualify as an exigency justifying Officer Smith's entry into the apartment.

It is important to remember that "all decisions made pursuant to the exigent circumstances exception must be made cautiously, for it is an exception which by its nature can very easily swallow the rule unless applied in only restricted circumstances." *Commonwealth v. English,* 839 A.2d 1136, 1141 (Pa. Super. 2003). (citations omitted) The events of the afternoon in question do not provide Officer Smith with a recognized exigency which would allow him to forgo obtaining a search warrant. Therefore, based on the above, the defendant's motion to suppress evidence and motion to suppress statements is granted.