J-A07031-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| SCOTT MICHAEL LOVELL, | |
| Appellant | No. 539 WDA 2014 |

Appeal from the Judgment of Sentence Entered March 6, 2014
In the Court of Common Pleas of Elk County
Criminal Division at No(s):
CP-24-CR-0000292-2013

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MUNDY, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED APRIL 13, 2015**

Appellant, Scott Michael Lovell, appeals from the judgment of sentence of 16-48 months' incarceration following his conviction for growing marijuana and related offenses.  Appellant claims the trial court erred when it denied his motion for a mistrial due to prosecutorial misconduct, and that retrial should be barred on double jeopardy grounds because the misconduct was so egregious.  Appellant also contends the trial court erred when it denied his motion to suppress the seized contraband.  After careful review, we affirm.

On July 25, 2012, Trooper James McIntosh of the Pennsylvania State Police (PSP) conducted aerial surveillance of Appellant's property in a rural area of Elk County.  That warrantless search was prompted by a tip from Anthony Milliard, Appellant's neighbor, who advised the PSP that Appellant

was growing marijuana. On the first flyover, Trooper McIntosh observed what he believed to be marijuana plants growing in buckets along a tree line on the east side of Appellant's property.[1] Trooper McIntosh then returned to his barracks and proceeded to Appellant's residence by ground. Upon his arrival, Trooper McIntosh met up with Trooper Emery Faith, and the two troopers drove up Appellant's driveway in separate vehicles. Trooper Faith moved quickly to detain Appellant, who was spotted outside of his home. Once detained, Appellant stated that "they are only male plants." N.T., 1/3/13, at 53. He also indicated that additional narcotics were located in his home.

The troopers seized approximately 11 marijuana plants from Appellant's property. Based on these seizures, other observations at the scene, and Appellant's statements, Trooper McIntosh obtained a warrant to search Appellant's home and an enclosed structure near the home that smelled of marijuana. During that ensuing search, a few more plants were seized, as well as paraphernalia related to marijuana cultivation.

Subsequently, the Commonwealth charged Appellant with manufacturing marijuana, 35 P.S. § 780–113(a)(30), possession of a controlled substance (marijuana), 35 P.S. § 780–113(a)(16), and possession

_____

[1] Trooper McIntosh purportedly made this observation with his naked eye, from 500-700 feet above ground, moving at approximately 75-85 miles per hour. N.T., 1/3/13, at 17-18.

of drug paraphernalia, 35 P.S. § 780–113(a)(32). Appellant filed an omnibus pre-trial motion on October 31, 2012, seeking, *inter alia*, suppression of his statements and the seized contraband. The trial court conducted a suppression hearing on January 3, 2013, and denied Appellant's suppression motion(s) on May 28, 2013. Appellant also filed a motion to compel discovery on February 7, 2013, which, pertinent to this appeal, sought discovery of the identity of an informant and lab results from the testing of the seized marijuana plants. The Commonwealth eventually revealed the identity of the informant six months prior to Appellant's trial after initially denying that he existed.

Appellant proceeded to a jury trial on December 12, 2013, where the jury convicted him of all three of the above offenses. On March 6, 2014, the trial court sentenced Appellant to an aggregate term of 16-48 months' incarceration. On April 2, 2014, Appellant filed a timely notice of appeal. He then filed a timely Pa.R.A.P. 1925(b) statement of errors complained of on appeal on April 24, 2014. The trial court issued its Rule 1925(a) opinion on June 6, 2014.

Appellant now presents the following allegations of error for our review:

[I.] The lower court erred in refusing to grant a mistrial and in failing to bar a re-trial based on the extensive prosecutorial misconduct of the district attorney throughout the case.

[II.] The lower court erred when it found that [Appellant]'s Fourth Amendment rights were not violated when the police

should have obtained a search warrant before going on[ ]to the property and securing any plants.

Appellant's Brief, at 7 (unnecessary capitalization omitted).

We apply the following standard of review to a claim that a trial court erred in refusing to grant a mistrial:

It is well-settled that the review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will ... discretion is abused. A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. A mistrial is not necessary where cautionary instructions are adequate to overcome prejudice.

*Commonwealth v. Brooker*, 103 A.3d 325, 332 (Pa. Super. 2014)

(quoting *Commonwealth v. Fortenbaugh*, 69 A.3d 191, 193 (Pa. 2013)).

Furthermore,

The phrase "prosecutorial misconduct" has been so abused as to lose any particular meaning. The claim either sounds in a specific constitutional provision that the prosecutor allegedly violated or, more frequently, like most trial issues, it implicates the narrow review available under Fourteenth Amendment due process. *See Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) ("To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial.") (internal quotation marks omitted); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ("When specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them."). However, "[t]he Due Process Clause is not a code of ethics for prosecutors; its concern is with the manner in which persons are deprived of their liberty." *Mabry v. Johnson*, 467 U.S. 504,

- 4 -

511, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984). The touchstone is the fairness of the trial, not the culpability of the prosecutor.

*Commonwealth v. Tedford*, 960 A.2d 1, 28 (Pa. 2008).

Appellant sought a mistrial based on multiple allegations of prosecutorial misconduct. We consider each allegation in turn.

The first subpart of Appellant's prosecutorial misconduct claim concerns Appellant's attempts to identify an informant who precipitated the initial aerial search of his property by the Trooper McIntosh. At the January 3, 2013 suppression hearing, Trooper McIntosh testified that he conducted aerial surveillance of Appellant's property because he "had received a tip that [Appellant] was growing [m]arijuana on the property." N.T., 1/3/13, at 62. When Appellant's counsel asked if Anthony Milliard, Appellant's neighbor, had been the source of the tip, the Commonwealth objected on relevancy grounds. The trial court sustained the Commonwealth's objection, reasoning that "[t]here's been no challenge to the search warrant itself in terms of the information that was supplied in support of the warrant. So I'll sustain that objection." *Id.* at 63.

On February, 4, 2013, the Commonwealth, in its response to Appellant's initial discovery request, denied the existence of an informant, thereby contradicting Trooper McIntosh's suppression hearing testimony. This prompted Appellant to file a motion to compel discovery on February 7, 2013. A hearing on that motion was held on March 4, 2013. Appellant notified the court of Trooper McIntosh's suppression hearing statement.

Nevertheless, the Commonwealth again denied the existence of any informant.

In an order dated March 4, 2013, the trial court neither denied nor granted Appellant's motion, but instead afforded him the opportunity to obtain and review the suppression hearing transcript in order to evidence Trooper McIntosh's suppression hearing statement. Appellant obtained the transcript, proved the Commonwealth's error, and, on June 7, 2013, the Commonwealth advised Appellant that Trooper McIntosh had received a tip from another Pennsylvania State Police officer, Trooper Agosti. Trooper Agosti then confirmed for Appellant that he had been tipped off by Anthony Milliard.

Appellant contends that the Commonwealth's conduct, as detailed above, constituted a *Brady*[2] violation. "To establish a *Brady* violation, a defendant must show that: (1) the evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence at issue is favorable to the defendant; and (3) the evidence was material, meaning that prejudice must have ensued." *Commonwealth v. Willis*, 46 A.3d 648, 667 (Pa. 2012).

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

Here, it is apparent that Appellant has satisfied the first element necessary to establish a **Brady** violation. The Commonwealth admitted that there was an informant in this case after having denied his existence. It is also plausible that knowledge of the informant could have served one or more defense strategies at trial. Therefore, the (temporarily) withheld evidence could be construed as "favorable" to Appellant, in satisfaction of the second **Brady** element.[3]

However, to be entitled to relief under **Brady**, Appellant must also show that the (temporarily) undisclosed evidence was material to his case, *i.e.*, that he was prejudiced by the Commonwealth's failure to disclose that evidence. The trial court rejected Appellant's **Brady** claim because the Commonwealth ultimately disclosed the existence and name of the informant six months before Appellant's trial. Nevertheless, Appellant contends that "[b]ecause of the District Attorney's withholding of information for 6 months, and due to the minimal information which was eventually provided by the District Attorney, [d]efense counsel was unable to adequately present the information to the jury regarding the tipster neighbor." Appellant's Brief, at 18. Appellant's argument appears to merely be a bald, unsubstantiated assertion of prejudice.

_____

[3] Appellant suggests that the informant's identity could have been used to buttress an argument to the jury that the informant, Appellant's neighbor, rather than Appellant, had planted the marijuana plants in the field on the outskirts of Appellant's property.

Evidence is material under **Brady**, and the failure to disclose it justifies setting aside a conviction, only where there exists a reasonable probability that had the evidence been disclosed the result at trial would have been different. Conversely, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial does not establish materiality in the constitutional sense."

**Commonwealth v. Chamberlain**, 30 A.3d 381, 409 (Pa. 2011) (internal citations omitted).

Here, Appellant's **Brady** claim is not based on the Commonwealth's failure to disclose evidence in the absolute sense, but on the Commonwealth's delay in disclosing that evidence. Thus, it is incumbent upon Appellant to demonstrate that the delay in disclosure prejudiced him to an extent that it affected the outcome of his trial. Appellant has not met this burden. The initially withheld evidence was disclosed well before Appellant's trial began, and he has not offered a plausible, specific argument as to how that initial delay hindered his defense at trial six months later. Accordingly, we conclude that this subpart of Appellant's prosecutorial misconduct claim lacks merit.

Next, Appellant claims that the prosecutor failed to provide him with an updated property log from the PSP. His entire argument is as follows:

As part of the discovery process, the District Attorney provided the State Police Incident Report as well as the State Police Property Record. … The Property Record which was provided by the District Attorney indicates the date and time the evidence was originally received at the state police barracks and the officer who received the evidence. However the Property Record is not complete in that it does not indicate when the evidence was taken from the

evidence room and taken to the lab for testing. It also does not show which items were taken to the lab to be tested. On December 4, 2013, approximately 8 days before the trial, defense counsel emailed the District Attorney requesting a copy of the property log. The purpose of the property log (also interchangeably referred to by defense counsel as a property record) was to establish the chain of custody for the material submitted to the lab. The District Attorney responded that he had previously supplied the property log in the original discovery and that he did not have an updated one. Defense counsel then viewed the property log but it was not updated and was not complete in that it did not indicate at the bottom portion when the evidence was taken out of the property room and taken to the lab. Obviously we know that the evidence was taken to the lab, but what was taken to the lab, when it was taken and by whom is information that the District Attorney did not provide to the defense.

During a discussion in chambers after trial had commenced, defense counsel explained that she was prejudiced because she had not received an updated property record. The property record would have allowed defense counsel to better prepare for the case. Part of the defense relied upon the fact that there had been another marijuana arrest at the Defendant's neighbor's house, which also related to the information regarding the tipster. Also, the property record provides important information regarding chain of custody. It would show when items were taken out of evidence, what was taken out of evidence, and when items were returned to evidence. This information is analyzed by the defense in order to prepare questions for the police at trial, including establishing a proper chain of custody.

The prosecutor's response to the missing property record during the trial was "I don't have an updated one in terms of when it went to the lab[,]" [a]gain demonstrating the complete lack of concern for [Appellant]'s right to discoverable documents.

Appellant's Brief, at 19-20 (internal citations to the record omitted).

Notably, Appellant does not allege any specific trial court error with respect to this claim. Additionally, the trial court found that

[t]he property log was not admitted into evidence, the initial request by [Appellant] to the Commonwealth does not appear of record, and there was no motion made on behalf of [Appellant] to compel an updated property log. The chain of custody for the marijuana was not directly challenged during trial, nor was there any objection made to the introduction or the admission into evidence of the marijuana plants.

TCO, at 4.

Nevertheless, Appellant included this claim when he requested a mistrial. However, Appellant has not explained how the prosecutor's actions (or inactions) regarding the property log impeded his trial strategy other than to baldly claim that "[t]he property record would have allowed defense counsel to better prepare for the case." Appellant's Brief, at 20. Appellant has not specified which of his constitutional rights, if any, were violated by the Commonwealth's (mis)conduct, nor has he cited any pertinent case law in support of this allegation. Accordingly, we conclude that the second subpart of Appellant's prosecutorial misconduct claim is under-developed, meritless, or both.

The third subpart of Appellant's prosecutorial misconduct claim concerns evidence of his relationship to the searched property. The document that provided indicia of Appellant's occupancy was referenced in the search warrant receipt, but neither it, nor its content, was provided to the defense prior to trial. Instead, the document was revealed, apparently for the first time since its seizure, in front of the jury. The indicia of

- 10 -

occupancy turned out to be a receipt for a payment that Appellant made to Elk County Probation.

Appellant complains that this document, from which the jury could have inferred otherwise inadmissible prior criminal conduct, should have been disclosed to him prior to trial. Furthermore, he claims the document should have been reviewed by defense counsel, the prosecution, and/or the court prior to having the witness read it aloud before the jury.

When this matter arose at trial, the District Attorney stated that he had no idea that the sealed envelope contained potentially inadmissible content until it was opened at trial.[4] N.T., 12/12/13, at 117-119. The District Attorney also argued that he had not acted in bad faith because he had no intention of presenting that document to the jury. The District Attorney stated that he intended to simply ask the PSP troopers if they had found indicia of Appellant's residency at the home during the search. The District Attorney argued that the document had only been revealed to the jury because of Appellant's best evidence objection to this testimony regarding the receipt. *Id.* at 110.

The trial court recognized the potential prejudice from reference to the probation department, and issued the following curative instruction to the jury:

_____

[4] The warrant receipt referred to this sealed document merely as, "Indicia of Occupancy (Receipt)." Trial Court Docket Entry 3, at 7.

I am now instructing you that as a matter of law, you may not consider the reference to probation in any way adverse to [Appellant]. You may not construe that in any way. You may not extrapolate that information or make any inferences from that information. In fact, you should not consider that whatsoever.

*Id.* at 154.

The trial court states that "[t]here was no objection lodged by [Appellant] to the cautionary instruction itself." TCO, at 5. Nevertheless, Appellant did argue during a lengthy sidebar preceding the curative instruction that a curative instruction could not undue the prejudicial nature of the probation reference. N.T., 12/12/13, at 132. Consequently, it is apparent from the record that Appellant did not concede that the instruction was sufficient to remedy his prior objection to the probation reference, nor did he waive the claim.

Nevertheless, the trial court considered Appellant's aggregate prosecutorial misconduct claim and found that

the totality of the circumstances did not rise to the level of manifest necessity to declare a mistrial, where 1) a cautionary instruction was provided regarding the reference to the receipt issued by the Elk County Probation Department[;] 2) the identity of the confidential informant was ultimately provided to the defense in June of 2013, some six months before trial[;] 3) the fact that the Commonwealth did not provide the crime lab report dated November 7, 2013, until … December 4, 2013, was not by any fault of the Commonwealth as it was not presented to the district attorney's office until December 4th[;] and 4) that the Commonwealth was not aware of items listed on the back page of the property record report, one of which was the reference to the probation department receipt. Considering all the factors, the Court determined that the discrepancies and the Commonwealth's failure to present the evidence to the defense

in as timely a manner as [Appellant] would have liked did not rise to the level of manifest necessity.

TCO, at 5-6.

Appellant claims he was denied a fair trial because of the actions of the Commonwealth in this case. However, as discussed above, the first two subparts to Appellant's claim do not provide a basis for relief. Despite the Commonwealth's initial denials, Appellant was provided with evidence concerning the informant six months prior to his trial, providing him with ample time to prepare any defense premised on that information. Regarding the property log discrepancies, Appellant failed to argue with adequate specificity how or why he was prejudiced by those discrepancies.

Thus, the only question that remains is whether the incident concerning the probation receipt deprived Appellant of a fair trial, and we agree with the trial court that it did not. We do recognize and acknowledge the District Attorney's lackluster performance of his duties in this case. However, for the purpose of a prosecutorial misconduct claim, "[t]he touchstone is the fairness of the trial, not the culpability of the prosecutor." *Tedford*, 960 A.2d at 28. Although the prosecutor should not have permitted his witness to read the probation receipt out loud before the jury without first reviewing its content, there was no mention of specific criminal conduct made, and the mention of probation was never repeated nor referenced again by the prosecutor. Moreover, the jury was instructed not to draw any adverse inference from the probation reference. *See Commonwealth v. Morris*, 519 A.2d 374 (Pa. 1986) (holding prejudice

from limited reference to specific prior criminal activity cured by immediate cautionary instruction and admonition in jury charge); ***and see Commonwealth v. Baker***, 614 A.2d 663, 672 (Pa. 1992) ("The presumption in our law is that the jury has followed instructions."). Consequently, we conclude that the trial court did not abuse its discretion when it denied Appellant's motion for a mistrial. As such, we need not address Appellant's derivative claim that retrial should be precluded on double jeopardy grounds.

Next, Appellant asserts that the police, absent exigent circumstances, should have obtained a warrant before entering his property to seize the marijuana plants discovered during the aerial surveillance of his property. He contends the trial court erred when it denied his motion to suppress the seized evidence on this basis.

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783-84 (Pa. Super. 2012) (quoting *Commonwealth v. Hoppert*, 39 A.3d 358, 361–62 (Pa. Super. 2012)).

The trial court determined that the aerial search that discovered the marijuana plants on Appellant's property was permissible under the 'open fields' doctrine. It then concluded that the PSP troopers' subsequent entry onto Appellant's property was "incident to detain any individuals found on the property in the context of the perpetration of a felony in the nature of the manufacture of a controlled substance[.]" TCO, at 9. Although we disagree with the entirety of the trial court's analysis, we ultimately agree with its conclusion to deny Appellant's suppression motion.

In *Commonwealth v. Russo*, 934 A.2d 1199 (Pa. 2007), our Supreme Court explained and discussed the 'open fields' doctrine as follows:

> The open fields doctrine was first recognized by the U.S. Supreme Court in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). In that case, while surveilling the home of Hester's father (where Hester lived), two revenue officers observed Hester exit the house and hand a quart bottle to an individual whom the officers suspected to be attempting to purchase illegal bootleg whiskey. After the officers began pursuing the two men, they fled, Hester discarding a jug and his would-be customer the bottle. Thereafter, the officers recovered the vessels at an undisclosed distance from the house and determined them to contain "moonshine whisky, that is, whisky illicitly distilled." *Id.* at 58, 44 S.Ct. at 446. Hester claimed that the evidence was inadmissible under the Fourth Amendment because the officers seized it without a warrant. In a brief opinion for a unanimous court, Justice Oliver Wendell Holmes, Jr., concluded that "[i]t is obvious that even if there had been a trespass, the [evidence] was not obtained by an illegal search or seizure." *Id.* Citing Blackstone's Commentaries on the Laws of

- 15 -

England, Justice Holmes held that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." *Id.* at 59, 44 S.Ct. at 446.

Sixty years later, in a 6–3 decision in ***Oliver v. United States***, [466 U.S. 170, (1984)], the High Court "reaffirm[ed]" the vitality of the open fields doctrine as announced in ***Hester***. ***Oliver***, 466 U.S. at 178, 104 S.Ct. at 1741; *id.* at 176 n.6, 104 S.Ct. at 1740 n.6 (rejecting the notion that "subsequent cases discredited ***Hester***'s reasoning"). Turning its attention initially to the constitutional text, the ***Oliver*** Court noted that open fields are not "effects" within the meaning of the Fourth Amendment. Indeed, the Court observed, "[t]he Framers would have understood the term 'effects' to be limited to personal, rather than real, property." *Id.* at 177 n. 7, 104 S.Ct. at 1740 n.7 (citing, as Justice Holmes did, Blackstone's Commentaries, among other sources).

Even assuming one had a subjective expectation of privacy in his open fields, the ***Oliver*** Court went on to reason, such an expectation is not one that society would be prepared to recognize as reasonable:

> [O]pen fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be. It is not generally true that fences or "No Trespassing" signs effectively bar the public from viewing open fields in rural areas. And both petitioner Oliver and respondent Thornton concede that the public and police lawfully may survey lands from the air.

*Id.* at 178, 104 S.Ct. at 1741–42.

Finally, the ***Oliver*** Court explicitly rejected the contention that the reasonableness of one's expectation of privacy in his open fields should be determined on an *ad hoc*, case-by-case basis:

Under this approach, police officers would have to guess before every search whether landowners had erected fences sufficiently high, posted a sufficient number of warning signs, or located contraband in an area sufficiently secluded to establish a right of privacy.... The lawfulness of a search would turn on a highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions. The *ad hoc* approach not only makes it difficult for the policeman to discern the scope of his authority; it also creates a danger that constitutional rights will be arbitrarily and inequitably enforced.

*Id.* at 181–82, 104 S.Ct. at 1743 (citations and quotation marks omitted). In this regard, the Court specifically

reject[ed] the suggestion that steps taken to protect privacy establish that expectations of privacy in an open field are legitimate. It is true, of course, that petitioner Oliver and respondent Thornton, in order to conceal their criminal activities, planted the mari[j]uana upon secluded land and erected fences and "No Trespassing" signs around the property. And it may be that because of such precautions, few members of the public stumbled upon the mari[j]uana crops seized by the police. Neither of these suppositions demonstrates, however, that the expectation of privacy was legitimate in the sense required by the Fourth Amendment. The test of legitimacy is not whether the individual chooses to conceal assertedly "private" activity. Rather, the correct inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.

*Id.* at 182–83, 104 S.Ct. at 1743 (footnote omitted).

*Russo*, 934 A.2d at 1203-05 (footnote omitted). Moreover, the Pennsylvania Supreme Court concluded in *Russo* that "the guarantees of Article I, Section 8 of the Pennsylvania Constitution do not extend to open fields; federal and state law, in this area, are coextensive." *Id.* at 1213.

Here, Appellant does not contend that the aerial surveillance of his property was illegal. Instead, he asserts that it was illegal for Troopers McIntosh and Emery to subsequently enter his property without a warrant, or in the absence of exigent circumstances, in order to seize the marijuana plants discovered during the aerial surveillance. He argues that to seize property discovered in plain view, the Commonwealth must view the contraband from a lawful vantage point and that there must be exigent circumstances justifying the seizure without a warrant.

However, Appellant does not dispute that the aerial surveillance was legal in this case. Indeed, for the same reason the aerial surveillance was not illegal, neither a warrant nor exigent circumstances were necessary to justify the seizure that occurred. Because the marijuana plants were located in open fields, Appellant lacked a legitimate expectation of privacy necessary to justify suppression of the seized plants. *Hester*, *Oliver*, *Russo*.

Appellant contends that *Commonwealth v. English*, 839 A.2d 1136 (Pa. Super. 2003), supports his claim that exigent circumstances were required to justify the warrantless seizure of the marijuana plants. In *English*,

> Cranberry Township Patrolman Robert O'Neill and Detective Frank Evanson received an anonymous tip that the occupants of 206 Hester Drive were growing marijuana on their back porch. The following day the officers went to the residence to investigate. They knocked several times on the front door, got no response, and then walked around toward the back of the house. Their path took them through a neighbor's yard. From the neighbor's yard they observed marijuana plants growing on [the] appellant's back deck. Officer O'Neill recognized the plants

- 18 -

as marijuana because of his experience and training. He explained that the plants were easily identifiable as they were elevated, sitting in a planter on top of a child's picnic table on the deck. The officers took photographs of the plants.

The officers knocked repeatedly on the back door, which was situated under the deck, and got no response. They tried the front door again, with the same result. Thereafter, the officers unlatched the gate to the deck, entered the deck and seized the plants.

*English*, 839 A.2d at 1138-39.

The *English* Court found that the marijuana plants had been discovered in plain view. However, it also found that the plants were located on the appellant's "deck[,] which was enclosed by a fence and a latched gate." *Id.* at 1141. The court determined that the plants' location clearly fell within the curtilage of the appellant's home, and the appellant had a legitimate expectation of privacy therein. *Id.*

As this Court has previously recognized:

Our courts have extended this constitutional protection to the curtilage of a person's home by analyzing factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private. Curtilage is entitled to constitutional protection from unreasonable searches and seizures as a place where the occupants have a reasonable expectation of privacy that society is prepared to accept.

*Commonwealth v. Simmen*, 58 A.3d 811, 815 (Pa. Super. 2012) (internal citations and quotation marks omitted).

Here, Appellant does not claim that the seized marijuana plants were seized from within the curtilage of his residence, nor does he contest the

trial court's determination that the plants were seized from open fields. Consequently, **English** does not support his claim.

We reject the trial court's conclusion that the seizure in question was permissible "in the context of the perpetration of a felony" because, among other things, the trial court has not provided any legal authority for such a conclusion. TCO, at 8. Nevertheless, "the suppression court's legal conclusions are not binding on an appellate court[.]" **McAdoo**, 46 A.3d at 784 (quoting **Hoppert**). Because we conclude that Appellant lacked a legitimate expectation of privacy in the location of the seized marijuana plants, his Fourth Amendment rights did not provide a basis to suppress that evidence. Accordingly, we conclude that Appellant's second claim lacks merit.

Judgment of sentence **affirmed**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/13/2015

- 20 -